**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**
-------------------------------------------------------------------x
JANE DOE,                                                    Civil Action No. 2:19-cv-05925

      *Plaintiff*

      v.

MCDONALD'S USA, LLC, and
TANWAY ENTERPRISES, L.P.,

      *Defendants*.
-------------------------------------------------------------------x

---

**PLAINTIFF JANE DOE'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT MCDONALD'S USA, LLC'S MOTION TO DISMISS PLAINTIFF JANE
DOE'S SECOND AMENDED COMPLAINT**

---

**DEREK SMITH LAW GROUP, PLLC**
**Attorneys for Plaintiff**
**Caroline H. Miller, Esq.**
**1835 Market Street, Suite 2950**
**Philadelphia, Pennsylvania 19103**
**(215) 391-4790**

I, Caroline H. Miller, Esq., an attorney duly admitted to practice law before the United States District Court for the Eastern District of Pennsylvania, hereby sets forth the following in opposition to Defendant MCDONALD'S USA, LLC's pending Motion to Dismiss Plaintiff Jane Doe's Second Amended Complaint.

I am an attorney with the Derek Smith Law Group, PLLC, attorneys of record for the Plaintiff herein. As such, I am fully familiar with the facts and circumstances of this matter based on a review of the documentation contained in the file maintained by this office, which I believe to be true.

This memorandum is submitted in opposition to the Defendant MCDONALD'S USA, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint for failure state a cause upon which relief can be granted.

## <u>STATEMENT OF UNDERLYING FACTUAL</u>

As indicated and fully outlined in Plaintiff's Second Amended Complaint, the alleged facts of this case are as follows:

In or around April 2018, Defendants McDonald's, by and through their then Store Manager, Stephanie Nicholson, scheduled Ms. Doe to interview for an open "Crew Member" position (Pl.'s Sec. Am. Compl. at 35).

On or around April 12, 2018, Ms. Doe entered the City Line Location and approached the register wherein Ms. Penn was positioned. Ms. Doe informed Mr. Penn that she was there to interview with Ms. Nicholson for the open "Crew Member" position (Pl.'s Sec. Am. Compl. at 36). Mr. Penn confirmed Ms. Doe's interview with his colleague Ms. Nicholson and instructed Ms. Doe to take a seat (Pl.'s Sec. Am. Compl. at 37). While seated, Ms. Doe observed Mr. Penn appear to make a call using a cell phone, presumably to contact Ms. Nicholson (Pl.'s Sec. Am. Compl. at 38).

Shortly thereafter, Mr. Penn approached Ms. Doe and informed her that Ms. Nicholson had forgotten their previously scheduled interview and instructed him to move forward with the interview in her absence (Pl.'s Sec. Am. Compl. at 39).  Mr. Penn further informed Ms. Doe that he would be meeting with another candidate and would return to her shortly. Mr. Penn provided Ms. Doe an Application Form to complete while she waited (Pl.'s Sec. Am. Compl. at 40).

After waiting for approximately forty-five (45) minutes, Mr. Penn approached Ms. Doe invited Ms. Doe to join him at a booth for her interview (Pl.'s Sec. Am. Compl. at 41). Mr. Penn began the "interview" Ms. Doe, reviewing with Ms. Doe her background information and prior experience (Pl.'s Sec. Am. Compl. at 42). At all times material, Mr. Penn was fully aware that Ms. Doe was a sixteen (16) year old minor (Pl.'s Sec. Am. Compl. at 43).

During the course of the interview, Ms. Doe's mother called to inquire about her status. At or around the same time, Mr. Penn was approached by a co-worker regarding another matter in the store. Mr. Penn permitted Ms. Doe the opportunity to answer the call, wherein Ms. Doe quickly informed her mother that the interview was ongoing and, therefore she could not speak. However, before Ms. Doe had the opportunity to hang-up, Mr. Penn grabbed her phone and began to speak with Ms. Doe's mother (Pl.'s Sec. Am. Compl. at 44).  Mr. Penn asked Ms. Doe's mother to describe Ms. Doe's strengths, weakness and personality. Caught off guard by the unusual request, Ms. Doe's mother respectfully responded explaining that her daughter is highly intelligent but also vert timid (Pl.'s Sec. Am. Compl. at 45). After hearing from her mother, Mr. Penn explained to both women that Ms. Doe is a strong candidate and would be a great fit for the position and would be moving forward with hiring her (Pl.'s Sec. Am. Compl. at 46).

After the conversation, and offering Ms. Doe the position, Mr. Penn continued to speak with Ms. Doe. Ms. Doe believed Mr. Penn was simply trying to get to further know his new hire as they would be working together going forward (Pl.'s Sec. Am. Compl. at 47). Mr. Penn instead shifted the conversation and requested that Ms. Doe unlock her phone so that he could "continue to investigate" who she was as a person. Unsure about his request but naïve to the interview process, Ms. Doe reluctantly complied (Pl.'s Sec. Am. Compl. at 48). Observing that Ms. Doe was uncomfortable by the request, Mr. Penn insisted that he had an unorthodox interview style, stating word to the effect of "*EVERY PERSON I INTERVIEW I GO THROUGH THEIR PHONE TO SEE IF THEY'RE REALLY THE PERSON THEY SAY THEY ARE. YOU KNOW YOUR PHONE ALWAYS TELLS YOU EVERYTHING ABOUT A PERSON*" (Pl.'s Sec. Am. Compl. at 49). Mr. Penn continued to explain his actions as he scrolled through Ms. Doe's phone, stating words to the effect of, "*I LIKE TO LEARN A PERSON'S PERSONALITY FIRST*

*BEFORE HIRING THEM BECAUSE WHAT IF YOU TELL ME ONE THING ABOUT YOURSELF AND WHILE YOU WORK YOU CHANGE. I ALSO DO THIS TO SEE WHERE I CAN FIT YOU IN AT, WHETHER YOU'LL GET ALONG WITH THE PEOPLE YOU WORK WITH*" (Pl.'s Sec. Am. Compl. at 50).

Mr. Penn continued to scrutinize the contents of the Ms. Doe's phone while asking Ms. Doe increasingly personal questions such as, "***HOW DO YOU FEEL ABOUT YOURSELF? I SEE YOU TAKE A LOT OF SELFIES. BUT I DON'T SEE ANY TYPE OF FULL BODY PICTURES***" (Pl.'s Sec. Am. Compl. at 51). Ms. Doe again reluctantly responded stating, "I GUESS I THINK HIGHLY OF MYSELF. YES, I LIKE SELFIES, BUT I DON'T HAVE A FULL MIRROR TO TAKE WHOLE BODY PICTURES NOR DO I GO OUT FOR SOMEONE TO TAKE A PICTURE OF ME" (Pl.'s Sec. Am. Compl. at 52). Mr. Penn responded, stating, "I UNDERSTAND, BECAUSE USUALLY THAT MAY MEAN SOMEONE IS INSECURE WHEN YOU SEE SOMETHING MORE THAN ANOTHER" (Pl.'s Sec. Am. Compl. at 53).

Mr. Penn continued to pry into Ms. Doe's personal life, asking "IS YOUR DUDE IN HERE" (Pl.'s Sec. Am. Compl. at 54)? When Ms. Doe gave an affirmative response, Mr. Penn excitedly responded, "HOW LONG HAVE YA'LL BEEN TOGETHER AND HOW OLD IS HE?" and "HE LOOKS OLDER" (Pl.'s Sec. Am. Compl. at 55).

Mr. Penn briefly returned to the topic of Ms. Doe's role with Defendants, stating, "WELL FROM WHAT I SAW, YOU SEEM TO HAVE A LOT OF POTENTIAL; YOUR CARING TOWARDS THE PEOPLE YOU LOVE, YOU'RE CONCEITED, OUTGOING AND SEEM LIKE YOU CAN BRING A LOT TO THIS COMPANY" (Pl.'s Sec. Am. Compl. at 56). Mr. Penn proceeded to tell Ms. Doe that she was hired and gave her specific instructions on how to

obtain the necessary working papers and new hire documentation (Pl.'s Sec. Am. Compl. at 57).

Immediately thereafter, Mr. Penn continued to speak with Ms. Doe about her text messages,

asking "YOU TOLD YOUR DUDE THAT YOU WERE GOING TO CRUSH THIS; HOW DID

YOU KNOW AND WHAT MADE YOU SAY THIS" (Pl.'s Sec. Am. Compl. at 58)? Ms. Doe

responded that she has "A LOT OF SELF-CONFIDENCE AND WAS TRYING TO STAY

POSITIVE" (Pl.'s Sec. Am. Compl. at 59).

Mr. Penn asked Ms. Doe about her starting availability for that week, wherein Ms. Doe

explained that she is available after she finishes her school day as well as on weekends (Pl.'s

Sec. Am. Compl. at 60).

After acknowledging her availability, Mr. Penn proceeded to offer his phone to Ms. Doe

to review its' contents, insisting, "IT IS ONLY FAIR" (Pl.'s Sec. Am. Compl. at 61).  Ms. Doe

attempted to refuse but was met with a stern and adamant insistence by Mr. Penn that she review

his pictures as he had done to her (Pl.'s Sec. Am. Compl. at 62). Worried that Mr. Doe would

rescind the job offer her had made momently earlier, Ms. Doe reluctantly agreed and began to

"swipe" through his images to placate his request (Pl.'s Sec. Am. Compl. at 64). Seemingly

excited by her actions, Mr. Penn asked, "WHAT DO YOU SEE?" to which Ms. Doe responded,

"A PICTURE OF YOU AND YOUR DAUGHTER ON A MOTORCYCLE" (Pl.'s Sec. Am.

Compl. at 65). Ms. Doe kept scrolling in hopes that Mr. Penn would stop her, but he only

became more excited. Suddenly, Ms. Doe became visibly alarmed at the sight of sexually

graphic pictures, including pictures of nude women and pictures of what Ms. Doe presumed to

be Mr. Penn's exposed genitals (Pl.'s Sec. Am. Compl. at 66). Mr. Penn, undeterred by Ms.

Doe's discomfort and noticeable disgust, asked Ms. Doe "**DO YOU HAVE ANY PICTURES**

**LIKE THIS**" (Pl.'s Sec. Am. Compl. at 67)? At all times material, Ms. Doe responded "**NO I**

**DON'T TAKE PICTURES LIKE THIS AND I FEEL UNCOMFORTABLE**" (Pl.'s Sec. Am. Compl. at 68).

Mr. Penn continued to inquire about Ms. Doe's personal life (Pl.'s Sec. Am. Compl. at 69). Mr. Penn asked Ms. Doe again about her boyfriend, asking countless invasive and unwelcome sexual questions such as, "**ARE YOU HAVING SEX WITH HIM?**" and "**DO YOU GIVE HIM ORAL SEX"** (Pl.'s Sec. Am. Compl. at 70)? Ms. Doe continued to insist she was uncomfortable and responded "**NO**" to Mr. Penn's barrage of inappropriate sexual questions (Pl.'s Sec. Am. Compl. at 71). Mr. Penn informed Ms. Doe that he was simply trying to "BREAK HER OUT OF HER SHYNESS" (Pl.'s Sec. Am. Compl. at 72). Mr. Penn then insisted that Ms. Doe position herself so that he could see her breasts beyond what could be viewed in her school uniform (Pl.'s Sec. Am. Compl. at 73). Ms. Doe began to cry and again responded "NO" (Pl.'s Sec. Am. Compl. at 74).

Mr. Penn concluded the "interview" by demanding that Ms. Doe provide him with her cell phone number (Pl.'s Sec. Am. Compl. at 75).  Ms. Doe felt uncomfortable with giving Mr. Penn her phone number based on the above harassment and instead requested he give his number to her (Pl.'s Sec. Am. Compl. at 76). Mr. Penn agreed and proceeded to encourage Ms. Doe to "**CALL ME WHEN YOUR MOTHER IS NOT AROUND**" (Pl.'s Sec. Am. Compl. at 77).

Mr. Penn informed Ms. Doe that she needed to bring her identification card and social security number with her to her first shift and offered to accompany Ms. Doe to obtain said documents if she didn't have them in her possession already. Also, Mr. Penn informed Ms. Doe that she would start on the following Sunday during the new pay period (Pl.'s Sec. Am. Compl. at 78). Ms. Doe agreed to the start date and quickly left the interview (Pl.'s Sec. Am. Compl. at 79). Ms. Doe immediately hurried home in a distraught manner, crying and visibly upset. During

her walk home, she frantically attempted to call her mother to no avail (Pl.'s Sec. Am. Compl. at 80).

Upon arriving home, Ms. Doe immediately went to her room and closed her door. Ms. Doe was scared and embarrassed by what had transpired and began uncontrollably crying (Pl.'s Sec. Am. Compl. at 81). Later that evening, upon arriving home from work, Ms. Doe's mother excitedly sought out her daughter to inquire about the interview. Upon entering Ms. Doe's room, Ms. Doe's mother noticed her daughter had been crying and was clearly upset (Pl.'s Sec. Am. Compl. at 82). Ms. Doe informed her mother of what occurred at which time they immediately contacted the police to file a police report (Pl.'s Sec. Am. Compl. at 83).

On or around that same day, Defendants constructively discharged Plaintiff. Defendants made conditions so onerous, abusive, and intolerable for Plaintiff that no woman in Plaintiff's shoes would have been expected to continue working under such conditions and such that Plaintiff choice to resign was void of choice or free will (Pl.'s Sec. Am. Compl. at 84).

That as a result of Defendants' conduct and comments, Plaintiff was caused to sustain serious and permanent personal injuries, including permanent psychological injuries (Pl.'s Sec. Am. Compl. at 85).  As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed (Pl.'s Sec. Am. Compl. at 86). Following the harassment, Plaintiff had overwhelming feelings of depression and anxiety. Plaintiff had episodes of uncontrollable crying, anger, loss of focus and motivation. She also had headaches, stomach aches, and a loss of appetite (Pl.'s Sec. Am. Compl. at 87).

## PROCEDURAL BACKGROUND

Prior to the commencement of this lawsuit, on August 13, 2019, Plaintiff timely dual filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), the Pennsylvania Human Relations Commission ("PHRC"), and the Philadelphia Commission on Human relations alleging violations of Title VII, the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 ("PHRA"), and the Philadelphia Fair Practices Ordinance, § 9-1100 *et. seq.* ("PFPO").

On September 18, 2019, the EEOC issued Plaintiff a Notice of Right to Sue within ninety (90) days. Additionally, on October 23, 2019, the PCHR issued Plaintiff a Dismissal and Notice of Rights.

On December 16, 2019, Plaintiff filed a Complaint against Defendant in this Court. *See Doc. No. 1.* On March 1, 2020, Defendant Tanway Enterprises, L.P filed an initial Motion to Dismiss Plaintiff's Complaint. *See Doc. No. 11* (Subsequently deemed moot by this Court on April 10, 2020. *See Doc. No. 15*).

On April 2, 2020, Plaintiff filed Plaintiff's First Amended Complaint. *See Doc. No. 13.* Defendant Tanway Enterprises, L.P. filed a renewed Motion to Dismiss Plaintiff's Amended Complaint on April 16, 2020. *See Doc. No. 23.* Defendant McDonald's USA, LCC's filed a Motion to Dismiss Plaintiff's Amended Complaint on April 16, 2020. *See Doc. No. 25.* On May 28, 2020, Plaintiff filed Plaintiff's Second Amended Complaint. *See Doc. No. 34.* Defendant Tanway Enterprises, L.P. filed this Partial Motion to Dismiss Plaintiff's Second Amended Complaint on June 8, 2020. *See Doc. No. 37.*

## STANDARD OF REVIEW UNDER
## FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6)

Defendant McDonald's Motion to Dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) should be denied in its entirety.

As an initial matter,  it in deciding a Motion to Dismiss under 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable pleadings of the complaint, the plaintiff may be entitled to relief." *Phillips v. City of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations and citations omitted).  After the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has factual plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* At 678 (citing *Twombly*, 550 U.S. at 556).  This standard, which applies in all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* At 678; *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("[A]ll civil complaints must contain more than an unadorned, the defendant-unlawfully-harmed-me-accusation.")(internal quotation marks omitted).

Ultimately, in deciding whether to grant a motion to dismiss, the  "'issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). A claim satisfies the plausibility standard when the facts alleged "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burch v. Milberg Factors, Inc.,* 662 F.3d 212, 220–21 (3d Cir.2011) (citing *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937). While the plausibility standard is not "akin to a 'probability requirement,' " there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal,*

556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief' ' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955).

The Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim;' " (2) "the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;' " and, (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago v. Warminster Township,* 629 F.3d 121, 130 (3d Cir.2010) (quoting *Iqbal,* 556 U.S. at 675, 679, 129 S.Ct. 1937) (footnote omitted) [1] ; *see also, Burtch,* 662 F.3d at 221; *Malleus v. George,* 641 F.3d 560, 563 (3d Cir.2011) ("This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.").

## **ARGUMENT**

**I.** **Plaintiff has Plead Sufficient Facts Setting Forth Plausible Claims for Relief Against Defendant McDonald's USA, LLC and Defendant Tanway Enterprises, L.P. as Joint Employers**

### *A. Plaintiff's Has Established the Extensive of a Joint Employer Relationship*

As is well settled under Title VII, the term 'employer' has been construed liberally and does not require a direct employer/employee relationship." *Lans v. Kiska Construction Corp*., No. 96 Civ. 4114, 1997 U.S. Dist. LEXIS 21271, 1997 WL 313162, (S.D.N.Y. April 18,

1997)("[I]n assessing whether a defendant is an 'employer' within the meaning of Title VII . . .

particular emphasis is placed on a defendant's right to control the 'manner and means' by which

work is accomplished." (quoting *Frankel v. Bally, Inc*., 987 F.2d 86, 90 (2d Cir. 1993))). *See also*

*Jiggetts v. Local 32BJ, SEIU*, 2011 U.S. Dist. LEXIS 103100, 23-24 (S.D.N.Y. Aug. 10, 2011).

In fact, a joint employment relation may exist where "one employer while contracting in good

faith with an otherwise independent company, has *retained for itself sufficient control of the*

*terms and conditions of employment of the employees who are employed by the other employer*."

*NLRB v. Browning-Ferris Industries of Pennsylvania*, 691 F.2d 1117, 1123 (3d Cir.1982)

(emphasis added). Ultimately, a joint employment relationship assumes the existence of two (or

more) separate and distinct legal entities that have "'historically chosen to handle jointly

important aspects of their employer- employee relationship.'" *id. at 1122* (internal alteration

omitted) (quoting *NLRB v. Checker Cab Co.,* 367 F.2d 692, 698 (6th Cir.1966)).

As it relates to claims under Title VII, the Third Circuit employees a *twelve-factor*

analysis to evaluate the exercise of control over the manner and mean of employment derived

directly from the Supreme Court. *See Faush v. Tuesday Morning, Inc*., 808 F.3D 208 ( 3d Cir.

2015). The *Darden* factors are a fact-specific, case-by-case assessment, not a simple, bright-line

test. The Supreme Court clearly articulated a non-exhaustive list of relevant factors to consider,

stating as follows:

> "We consider the hiring party's right to control the manner and means by which the
> product is accomplished. Among the other factors relevant to this inquiry are the skill
> required; the source of the instrumentalities and tools; the location of the work; the
> duration of the relationship between the parties; whether the hiring party has the right to
> assign additional projects to the hired party; the extent of the hired party's discretion over
> when and how long to work; the method of payment; the hired party's role in hiring and
> paying assistants; whether the work is part of the regular business of the hiring party;
> whether the hiring party is in business; the provision of employee benefits; and the tax
> treatment of the hired party."

*Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323-324 (1992) (*See also Faush v. Tuesday Morning, Inc.*, 808 F. 3d 208, 213 (3d Cir., 2015).

Defendant McDonald's asserts that Plaintiff failed to plead sufficient facts to establish a joint employer relationship, minimizing the extensive decision in *Darden* to three factors: (1) payment of wages, (2) the ability to hire and/or fire, and (3) "operational control." As a result of this narrow reading, Defendant McDonald's would have the Court believe that their role was merely contractual, despite their contractual relationship requiring much more extensive oversight and interactions. Ultimately, the Court in *Darden* insists that as "no shorthand formula or magic phrase can be applied to find the answer, ... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Id.* at 324; *citing NLRB v. United Ins. Co. of America,* 390 U.S., at 258, 88 S. Ct., at 991. "Although no factor is dispositive, the paramount factor is the right to control the manner in which the work is accomplished." *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 320 (3d. Cir. 2016).  Furthermore, the Pennsylvania Supreme Court has maintained that "control over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status." *Universal Am–Can, Ltd. v. Workers' Comp. Appeal Bd.*, 563 Pa. 480, 762 A.2d 328, 333 (2000) (calling these factors the "dominant considerations"); *see Lynch*, 554 A.2d at 160 ("[T]he right to control is the most persuasive indication of [employee or independent contractor status]."). "Actual control of the manner of work is not essential; rather, it is the right to control which is determinative." *Drexel v. Union Prescription Ctrs.*, *Inc.*, 582 F.2d 781, 785 (3d Cir. 1978).

Defendant McDonald's and Defendant Tanway entered into a mutually beneficial Franchise agreement, wherein, according to *Darden,* those individuals employed at their jointly operated facility were in fact employees of both Defendants.

As an initial factor, it is clear that the skills required of both Plaintiff and Mr. Penn, while enforced daily by Defendant Tanway, were expressly established and regularly maintained by Defendant McDonald's. These skills were articulated in the operation manual provided by Defendant McDonald's, and further emphasized in the business practices and policies also established by Defendant McDonald's. *See* Doc. 34, Par. 19. Even more directly, Defendant McDonald's emphatically mandated control over training of staff, retaining the ability to require business managers receive training specifically provided by Defendant McDonald's. *Id.* at 21. Said training was conducted, maintained, and staffed entirely at the cost of Defendant McDonald's. In fact, upon information and belief, Defendant McDonald's required a minimum of one (1) week of said training. *Id*.

In hiring employees, Defendant Tanway was required to ensure hiring of employees who were "adequate" as set by Defendant McDonald's standards. *See* Doc. 34, Par. 23. It stands by reason that while the individual decision to hire Ms. Doe was made by Mr. Penn, that decision was guided directly by standards set by Defendant McDonald's through its contractual relationship with Defendant Tanway. Defendant McDonald's stressed the importance of "uniformity," not just of service and facilities, but also uniformity of quality and appearance of those employed by the Defendants. *See* Doc. 34, Par. 25.

Furthermore, Defendant McDonald's maintained control of conducting daily business, including instructions as to proper store inventory and tools, utilized by the employees. *See* Doc. 34, Par. 20. Defendant McDonald's also directed Defendant Tanway, and as a result, Plaintiff on the precise uniform which Plaintiff would be obligated to wear, personal appearance guidelines by which Plaintiff would have to abide, and quality of service which Plaintiff *must* abide by in order to continue employment. *See* Doc. 34, Par. 23.

As for the third element, "location worked," Plaintiff was set to work exclusively at the City Line Location which was the basis of the contracted relationship between McDonald's and Tanway. In fact, said location was provided expressly by Defendant McDonald's for use by Tanway. *See* Doc. 34, Par. 17; *See also* Doc. No. 35-1, "Franchise Agreement", Par. 1(b), 2(a)(i) and 2(a)(iv).

While Plaintiff's employment relationship was brief, it can be stated that relationship was equal in length with both Defendant McDonald's and Tanway, having resigned on the same day wherein she accepted employment. *See* Doc. 34, Par. 84. To the contrary, the franchise relationship between Defendant McDonald's and Defendant Tanway appears to have been in place for, at a minimum, nearly seven and half years prior to Plaintiff's hiring. *See also* Doc. No. 35-1, "Franchise Agreement", Page 17.

Ms. Doe's job responsibilities were expressly asserted by Defendant McDonald's who established job roles and responsibilities which it then articulated to Defendant Tanway. *See* Doc. 34, Par. 23-24.

While Defendant Tanway was responsible for setting Plaintiff's daily work schedule, said schedule was established in accordance with specific hour of operation guideline set by Defendant McDonald's. *See* Doc. 34, Par. 23.

Defendant McDonald's further maintained the right to inspect Defendant Tanway's bookkeeping, accounting, and tax records and required precise compliance with all federal, state, and local law/ordinances. Defendant Tanway's mechanism of payment as well as tax treatment of payment to Plaintiff would logically have to abide by these same laws, freely inspected by Defendant McDonald's to ensure compliance. *See* Doc. 34, Par. 26.

Defendant McDonald's was and still is an international business which, in creating its relationship with franchisees, ensures that all steps are taken to ensure a replicated and identical experience for customers and employees globally. *Id*. Defendant McDonald's placed high value in maintaining the monitored supervision to ensure accountability of Defendant Tanway under and within their "system." *Id*. In fact, continuity in the business practices was of such high value that failure by Defendant Tanway to maintain the restaurant in accordance with Defendant McDonald's policies, and/or conduct which would reflect negatively upon Defendant McDonald's reputation and good standing would create immediate grounds to terminate their relationship, resulting in the termination of the employees under said relationship. *Id*. at 28.

As determined by the court in *Ward, "*the definition of employer and employee under the remedial statutes at-issue are broad and capacious*."* 2019 WL 643605, at *5 (D. N.J. 2019). Similar to the facts in the instant matter, the franchisor Defendant in *Ward* controlled the "days and times during which work may be done, the methods and techniques under which work should be done, and has a say in what personnel are hired," creating a plausibly plead claim under Title VII. *Id*.

In *Myers v. Garfield & Johnson Enterprises*, the Court found that the plaintiff set forth a plausible claim that the franchisor, Jackson Hewitt, was a joint employer of the plaintiff. 679 F.Supp.2d 598 (E.D. Pa. 2010). The Court in *Myers* considered the following factors which are directly relevant in our case, including but not limited to whether the franchisor, Jackson Hewitt, had the "right, but not the obligation," to inspect franchisees' office locations and granting Jackson Hewitt permission to inspect the contents of computers at those locations". The franchisor also published "detailed policies and procedures for its franchisees." The franchisor also published and periodically updated a compliance manual setting forth "mandatory standards, specifications and

requirements of the franchised system"; this manual, *inter alia*, specifies the hours at which franchise locations are to be open. The franchisor required that the franchisee employees complete training programs designed by Jackson Hewitt and monitors all such training. The franchisor manual also referred to certain circumstances in which the franchisee is *immediately* required to dismiss an employee. The franchise agreement is terminable if any employee or manager fails to complete the required Jackson Hewitt training, if the franchisee commits "any act within or without the Franchised Business that would tend, in [Jackson Hewitt's] opinion, to reflect poorly on the goodwill of [Jackson Hewitt's] name" or marks, or violates any law or regulation pertaining to the franchised business. *Id.*

As in *Myers,* and expressed in detail above, Defendant McDonald's exercises a high level of control over the Defendant Tanway, thereby creating a joint employer relationship. As set by the Franchise Agreement entered into by the Defendants in 2010, Defendant Tanway was expressly obligated "adopt and use the McDonald's System" including, enroll its mangers at Hamburger University, operate seven (7) days per week between 7:00AM and 11PM at a minimum, employ "adequate personnel as to operate the Restaurant", and require each employee to were the properly designated uniform as specified by Defendant McDonald's. *See* Doc. No. 35-1, "Franchise Agreement," Page 6-7; *See also* Doc. 34, Par. 23.

Furthermore, Defendant McDonald's was obligated to "advise and consult with [Tanway] periodically in connection with the operation of the Restaurant", provide defendant Tanway with business manuals prepared by Defendant McDonald's which include "(a) required operation procedures; (b) methods of inventory control; (c) book keeping and accounting procedures; (d) business practices and policies; and (e) other advertising and management policies" and provide training for Tanway employees at "Hamburger University." *Id*. at Page 3-4. Not only did

Defendant McDonald's repeatedly include language expressing the importance of Defendant Tanway's compliance with the "McDonald's System," it further retained the express ability to "inspect the Restaurant at all reasonable times to ensure that Franchisee's operations thereof is in compliance with the standards and policies of the McDonald's System." *Id.* at Page 6, provision 12. Defendant McDonald's expressly established these requirements, not to separate itself from Defendant Tanway, but rather to intricately intertwine the two entities, ensuring express control and ability to mandate change over the course of their relationship. *See* Doc. 34, Par. 22.

All of the above articulated steps, regulations, and supervision were expressly maintained by Defendant McDonald's to ensure one thing: continuity of business. *See* Doc. 34, Par. 27. Contrary to the defendant in *Harris*, Defendant McDonald's maintained an express "System," one which Defendant Tanway had no ability to create, edit, amend, or adjust, but simply implement to dictate employee behavior and practices accordingly. *See Harris v. Midas,* 2019 WL 1427052, at *2 (W.D. Pa. 2019). In analyzing the franchise relationship for the purpose of summary judgement, the court in *Harris* additionally references the underlying amended complaint, asserting that the Plaintiff "Plausibly alleged – again, based on the Franchise Agreement – that the TBC Defendants *could have* exercised some day-to-day control over employees at the Lower Burrell store. (….) This stemmed from the TBC Defendants' alleged abilities to visit and inspect the store, to train employees in the "Midas System," and to require employees to attend trainings." *Id.* at *3.

Both the *Harris* and *DeFlavis* decisions turned, not on the plain reading of the franchise agreement itself, but instead, on the *discovery* utilized to evaluate the day-to-day application of said agreement. Applying the same reasoning herein would be untimely and void Plaintiff of the

opportunity to conduct discovery on the applicable Franchise Agreement and relationship in question herein.

Furthermore, Defendant McDonald's argument relies, in part, upon an inapplicable standard to the matter at hand. As articulated at length above, as it relates to claims under Title VII, the Third Circuit employees a multi-factor analysis to evaluate the exercise of control over the manner and mean of employment. *Faush v. Tuesday Morning, Inc*., 808 F.3D 208 ( 3d Cir. 2015). This standard is dictated by the elements set forth by the Supreme Court in *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323 (1992). Both *Harris* and *DiFlavis* utilized by the Defendant are decided based on the factors set forth in *In re Enterprise Rent–A–Car Wage & Hour Empl. Practices Litig.,* 735 F.Supp.2d 277 (W.D.Pa.2010). *Enterprise*, while highly probative in evaluating wage and hour claims is inapplicable to the case at hand. Contrary to cases relied upon by the Defendant McDonald's, Plaintiff's Second Amended Complaint not only lays out the existence of a joint employer relationship in accordance with *Faush,* but further articulates and provides particular assertions as to Defendant McDonald's role as Plaintiff Doe's employer.

For the foregoing reasons, the Franchise Agreement entered into by Defendant Tanway and Defendant McDonald's, created a clear contractual relationship, wherein Defendants became joint employers of Plaintiff Doe and/or a "single employer" of Plaintiff. *See Cook v. Arrowsmith Shelburne*, 69 F.3d 1235 (2d Cir. 1995).

### B.  *Plaintiff's Claims Properly Pleads the Existence of a Joint Employer Relationship through Group Pleadings*

Defendant McDonald's again takes the position that they have not been provided fair notice of the claims against them due to what they deem as impermissible group pleadings in violation of Rule 8 of the Federal Rules of Civil Procedure.

In particular, Defendant McDonald's relies heavily on the decisions of both the Middle and Western District of Pennsylvania to support their assertions despite these cases being clearly distinguishable, if not being completely inapplicable, to the facts at hand. The *Sida* case concerned a putative class action asserting violations of the Fair Labor Standards Act and Pennsylvania Wage Payment and Collection Law. *Sida v. Pintura Construction LLC*, 2018 WL 6258604 (W.D. Pa. Nov. 30, 2018). The Court's ultimate decision was based on the Sida's failure to plead nothing more than "bare assertions" of a joint employer relationship. *Sida*, at *2-3 ("Plaintiff does not identify which of the Defendants he performed the work for, who supervised him, who exercised control over him, or any facts whatsoever that link his job duties, the work he performed, and the overtime he is allegedly owed, to any alleged employer in particular."). Unlike the case herein, the complaint in *Sida* relied on the simple assertion that the defendants were the plaintiff's "joint employer," failing to plead any supportive facts other than a conclusory statement that the defendants "employed Plaintiff and similarly situated employees." *Sida* at *2.

Similarly, *Attanasio* concerned a collective action pursuant to the Fair Labor Standards Act. *Attanasio v. Community Health Systems, Inc.*, 863 F. Supp. 2d 417 (M.D. Pa. 2012). The Court in *Attanasio* asserted that the Plaintiff's amended Complaint failed to provide "details suggesting exactly *how* CHS exercised authority over the particular employees, *how* these

employees were supervised by a Delaware corporation headquartered in Tennessee acting
through a holding company, and *how* they oversaw the administration of the business records."
*Attanasio,* at 425-426 ("[T]he Amended Complaint omits particularized assertions explaining the
specific role CHS played in regard to the Plaintiffs within this administrative structure. There are
no supporting details as to the mechanics of CHS's actual involvement as a parent corporation
that would raise Plaintiff's assertions above a speculative level"). Similar to *Sida*, the court in
*Attanasio* took issue with the plaintiff's failure to plead facts addressing the defendant's actual
involvement.

Contrary to the decisions in *Sida* and *Attanasio*, the court in *Ward*, in reviewing similar
group pleadings, determined that the amended complaint therein provided specific detail
describing the actions taken by the alleged harasser, stating unequivocally, "[o]bviously, an
entity may only act through its agents" *Ward,* at *6. As with *Ward*, the Second Amended
Complaint filed by the Plaintiff herein described in detail the unlawful harassment of the Ms.
Doe at the hands of the Defendants' agent, Mr. Penn. "The reference to agents in the definition
of employer is simply to incorporate *respondeat superior* liability into Title VII." *Behrens v.
Rutgers Univ.,* No. 94-cv-358 (JBS), 1996 WL 570989, at *5, 1996 U.S. Dist. LEXIS 22311, at
*15-17 (D.N.J. Mar. 29, 1996) (internal quotations and citations omitted).

While the Defense boldly asserts that Plaintiff's pleading in the Second Amended
complaint is merely an effort to pull the wool over the eyes of the Court, the standard imposed
by Defendant McDonald's interpretation of the law would require an unreasonable burden upon
the Plaintiff wherein every reference to Mr. Penn's employer, Plaintiff would be required to
identify jointly both Defendant McDonald's and Defendant Tanway, a requirement which is well
beyond any interpretation of the pleading standard set by this court. Accordingly, Plaintiff

respectfully requests the Court deny the Defendant McDonald's Motion to Dismiss on these grounds.

## II. Defendants Motion to Dismiss Plaintiff's Claim for Intentional Infliction of Emotional Distress Should be Denied

To the extent Defendant McDonald's asserts a claim for dismissal based on Tanway's Motion to Dismiss, Plaintiff incorporates by Reference her opposition to Defendant Tanyway's Motion to Dismiss herein as to further minimize duplicative briefing.

## CONCLUSION

In conclusion, as established above, Plaintiff Doe has set forth plausible claims for relief against Defendant McDonald's USA, LLC and Defendant Tanway Enterprises, L.P. as Joint Employers. Additionally, as fully set forth in Plaintiff Doe's Opposition to Defendant Tanway Enterprises, L.P.'s Motion to Dismiss, Plaintiff has set forth cognizable claims for intentional, as well as cognizable claims establishing vicarious liability for Mr. Penn's conduct during the course of his employment. Plaintiff has plead sufficient facts such that all defendants should remain in the case. Plaintiff will be severely prejudiced should Defendant McDonald's USA, LLC's Motion to Dismiss be granted. Accordingly, based on the foregoing legal authority and facts alleged in the Plaintiff's Second Amended Complaint, Plaintiff respectfully requests that this Court deny Defendant McDonald's USA, LLC's Motion to Dismiss in its entirety, and order Defendant McDonald's USA, LLC to file an Answer to Plaintiff's Second Amended Complaint.

Dated: June 22, 2020
      Philadelphia, PA

    Respectfully submitted,

    **DEREK SMITH LAW GROUP, PLLC**

    _____
    Caroline H. Miller, Esq.
    *Attorneys for Plaintiffs*