```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JANE DOE,                          :   CIVIL ACTION
                                   :   NO. 19-05925
        Plaintiff                  :
    v.                             :
                                   :
MCDONALD'S USA, LLC, et al.        :
                                   :
        Defendants.                :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              June 2, 2022

I.   **INTRODUCTION**

This case involves claims by Plaintiff Tamiah Marcellus ("Plaintiff") against Defendant Tanway Enterprises ("Tanway" or "Defendant"), an entity that owns franchise restaurants in the Philadelphia area. Plaintiff's claims arise from alleged misconduct by Darnell Penn ("Penn"), the shift supervisor at one of Defendant's franchise restaurants. Plaintiff brings the claims against Defendant for hostile work environment and quid pro quo sexual harassment in violation of Title VII, the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance ("PFPO"). Defendant argues that Plaintiff's claims for hostile work environment and quid pro quo sexual harassment fail as a matter of law.

Before the Court is the Defendant's motion for summary judgment. For the reasons set forth below, the Court will grant Defendant's motion in part and deny Defendant's motion in part.

**II.   BACKGROUND**

Tanway Enterprises is an entity that owns and operates twelve franchise restaurants in the Philadelphia area, including the McDonald's located at 7500 City Avenue in Philadelphia (the "McDonald's"). In January 2018, Defendant interviewed and hired Penn for a shift manager role at the McDonald's. Before hiring Penn, Defendant called Penn's references who provided positive feedback about Penn. Penn's duties as a shift manager included ensuring the effective operation of the restaurant during his scheduled shifts.

On April 12, 2018, then sixteen-year old Plaintiff was scheduled to interview at the McDonald's for a role as a "Crew Member." When Plaintiff arrived at the McDonald's she believed she would be interviewing with an individual named Stephanie, but Penn introduced himself and informed Plaintiff that he would be conducting Plaintiff's interview. Penn then sat with Plaintiff at a round table in the restaurant. No customers were in the store at that time. See Pl. Dep. 42:17-19, ECF No. 69-4.

Penn started by asking Plaintiff typical job-related questions. Penn then asked Plaintiff to give him her phone. Penn

explained that "every person I interview I go through their phone to see if they're really the person they say they are. You know your phone always tells you everything about a person." Pl.'s Contemporaneous Stmt. at 4, ECF No. 69-10. While reviewing the images on Plaintiff's phone he said, "I see you take a lot of pictures, you like selfies but I don't see no type of full body pictures." Id. at 4-5. Penn then began asking Plaintiff personal questions about her boyfriend, including asking how long they had been together.[1]

Midway through the interview, Plaintiff received a call from her mother. Plaintiff asked Penn if she could return her mother's call, and once Penn indicated Plaintiff could do so, Plaintiff told her mother the interview was ongoing. Penn then asked to speak with Plaintiff's mother. Plaintiff handed Penn the phone, and Penn told Plaintiff's mother that Plaintiff was a strong candidate and he would be moving forward with hiring her.

Though Penn was authorized to conduct interviews and recommend candidates for employment, Defendant maintains Penn

---

[1] Plaintiff prepared a contemporaneous witness statement the day after the interview. In that statement, Plaintiff wrote that Penn asked to view her phone during the first half of the interview. However, during Plaintiff's deposition, she conceded that Penn looked through her phone at a later point. See Pl. Dep. 115:9-13. The Court will rely on Plaintiff's contemporaneous witness statement for this timeline of events because Plaintiff prepared the witness statements when the events were fresh in her mind.

did not have express authority to make ultimate hiring decisions. However, at the interview with Plaintiff, he represented to Plaintiff that he had the power to hire Plaintiff, offered Plaintiff the job, and advised Plaintiff to return to McDonald's the following Sunday with copies of her identification so she could begin employee training. Plaintiff accepted the "offer."

Once the "offer" was accepted by Plaintiff, Penn continued speaking with Plaintiff and insisted Plaintiff look at images on his cell phone. Plaintiff initially declined, but at Penn's insistence, she eventually agreed to review the images. Penn showed Plaintiff a number of graphic images, including images of nude women. Although Plaintiff did not verbalize it, through her facial expressions, Plaintiff expressed that she was uncomfortable viewing the images. Penn then asked Plaintiff to lean forward and unbutton her shirt so he could see her breasts. Plaintiff refused and told Penn she was uncomfortable doing so. Penn then concluded the conversation and told Plaintiff to take his phone number or to give him her phone number because she had been hired. As Plaintiff left, Penn stated, "[w]e're going to keep this between us right?" Pl. Dep. 40:14-16. Plaintiff did not respond.

Plaintiff failed to show up for work the following Sunday, did not fill out any paperwork, and did not participate in the

4

onboarding process required by Defendant. That same day, Plaintiff filed a police report about the incident. The police, in turn, provided a copy of the incident report to Defendant. Prior to receiving a copy of the police report and initiating an investigation, and apparently independent from the circumstances of this case, Defendant terminated Penn's employment.

Plaintiff brought the instant action against Defendant under the theories of hostile work environment, quid pro quo sexual harassment, negligent supervision, hiring, and training, and intentional infliction of emotional distress. On December 3, 2021, the Court granted Defendant's Partial Motion to Dismiss the intentional infliction of emotional distress claim against it. See Doe v. McDonald's USA, LLC, 504 F. Supp. 3d 360 (E.D. Pa. 2020).[2] Plaintiff has since requested to withdraw her claim for negligence. Thus, the only claims that remain are Plaintiff's claims for hostile work environment and quid pro quo sexual harassment against Defendant.

### III. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

[2] Plaintiff also named McDonald's USA as a defendant. The Court previously granted McDonald's USA's Motion to Dismiss all claims against it. See id.

5

P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A factual dispute is genuine if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. If the movant meets this obligation, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. At the summary judgment stage, the Court must view the facts "in the light most favorable to" the nonmoving party and "draw all reasonable inferences in favor" of that party. Young v. Martin, 801 F.3d 172, 174 n.2 (3d Cir. 2015) (citing Tri-M Grp., LLC v. Sharp, 638 F.3d 406, 415 (3d Cir. 2011)).

## IV. DISCUSSION

Defendant first argues that the Court cannot consider certain evidence Plaintiff relies upon because Plaintiff submitted a "sham affidavit." Defendant next argues that Plaintiff's claims for hostile work environment and quid pro quo sexual harassment fail as a matter of law. These arguments will be addressed in turn.

**A.   Sham Affidavit**

The Court views the facts in the light most favorable to Plaintiff as the non-moving party. However, in its reply, Defendant avers that Plaintiff's Counterstatement of Material Facts (ECF No. 69-1) and Plaintiff's Declaration (ECF No. 69-3) should be disregarded because Plaintiff's declaration consists of "self-serving statements that contradict her prior sworn deposition testimony." Def.'s Reply at 3, ECF No. 70-1. Defendant contends that because Plaintiff's declaration was signed over six months after the date of her deposition, and because the declaration contains information not included in Plaintiff's deposition testimony, it should be disregarded as a "sham affidavit."

Pursuant to the "sham affidavit doctrine," a trial judge may disregard affidavits that contradict earlier deposition testimony when deciding motions for summary judgment. Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). An affidavit that contradicts an individual's earlier testimony "indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." Id. Thus, "[a] sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." Id.

7

"If it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." Id. This rule makes practical sense, as "prior depositions are more reliable than affidavits," which "are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible." Id. Additionally, "[t]he subsequent affidavit need not directly contradict the earlier deposition testimony if there are other reasons to doubt its veracity, such as its inclusion of 'eleventh-hour revelations' that could have easily been discovered earlier." Cellucci v. RBS Citizens, N.A., 987 F. Supp. 2d 578, 583 n.2 (E.D. Pa. 2013) (Robreno, J.) (citing Jiminez, 503 F.3d at 254-55).

Here, several portions of Plaintiff's declaration are directly contradicted by Plaintiff's deposition testimony. For example, Plaintiff's declaration provides that Penn showed Plaintiff photos on his phone, including an image of Penn's exposed genitals. Pl. Decl. ¶ 41, ECF No. 69-2. However, when asked what photos Penn showed Plaintiff during her deposition, Plaintiff testified that she saw pictures of nude women, a picture of a bike, and a picture of a child. Plaintiff

8

explicitly testified that she did not recall seeing anything else. Pl. Dep. 47:16-24.

Plaintiff's declaration also indicates that after Penn showed her the pictures on his phone of the nude women, Penn asked Plaintiff "[d]o you have any pictures like this?" Pl. Decl. ¶ 42. However, in responding to the question "[c]an you walk me through what happened," Plaintiff never indicated that Penn asked her if she has "any pictures like this." Pl. Dep. 33:11-12.

Plaintiff's declaration further provides that Penn asked Plaintiff questions such as "[a]re you having sex with [Plaintiff's boyfriend]," and [d]o you give him [oral sex]?" Pl. Decl. ¶ 42. (last alteration in original). However, when questioned about what Penn asked Plaintiff about her boyfriend, Plaintiff testified:

> I remember him asking me is that your dude in [Plaintiff's phone] and I said yes. He also asked me something about did I tell him how the interview was going or how did I feel about the interview. And I told him that I told my ex-boyfriend that I was nervous, but I know I got this.

Pl. Dep. 117:9-16. Plaintiff never indicated that Penn asked her the sexually explicit questions.

The declaration also provides that Penn demanded Plaintiff provide him with her cell phone number. Plaintiff's declaration states that she "thought quickly and suggested that he instead

9

provide me with his number," and after Penn agreed, Penn told Plaintiff to "[c]all me when your mother is not around." Pl. Decl. ¶ 51. However, in responding to the question "[c]an you walk me through what happened," Plaintiff testified that, at the end of the interview, Penn told her "to take his phone number down or give him my phone number because I was hired." Pl. Dep. 33:11-12, 40:3-5. Plaintiff did not testify that Penn demanded he take her phone number or that Penn told her to call him when her mother was not around.

Finally, the declaration requests that Plaintiff "be given [her] day in Court to combat the outrageous racial harassment and discrimination that [she] encountered at the hands of [her] former employers." Pl. Decl. ¶ 69. However, Plaintiff makes no allegations of racial harassment or racial discrimination in this case.

Here, Plaintiff's declaration contains information that directly contradicts Plaintiff's deposition testimony. Additionally, it was signed the same day Plaintiff's counsel submitted the opposition to Defendant's motion for summary judgment, which was over six months after Plaintiff's deposition was taken. Thus, there are reasons to doubt the veracity of Plaintiff's declaration as it appears it was prepared by counsel in an effort to defeat summary judgment. Accordingly, the Court will only consider the facts included in Plaintiff's

10

Counterstatement of Material Facts and memorandum of law that are supported by Plaintiff's deposition testimony or by other evidence.[3]

### B. Hostile Work Environment

To establish a hostile work environment claim under Title VII[4], a plaintiff must show: "(1) [S]he suffered intentional discrimination . . . ; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist., 971 F.3d 416, 428 (3d Cir. 2020) (quoting Komis v. Sec'y of U.S. Dep't of Labor, 918 F.3d 289, 293 (3d Cir. 2019)) (alteration in original). Defendant argues

---

[3]   This is consistent with the Court's description of the facts as outlined in the "Background" section of this memorandum. See supra section II.

[4]   The Court need not separately analyze Plaintiff's PHRA claim, as "the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002) (citing Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996)). Here, neither party argues the PHRA should be interpreted any differently from Title VII in this case. Additionally, the Court need not separately analyze Plaintiff's PFPO claim as PFPO claims "are generally evaluated under the same legal standard as Title VII claims" as well. Darby v. Temple Univ., 216 F. Supp. 535, 543 (E.D. Pa. 2016).

that (1) Plaintiff cannot maintain her claim for hostile work environment because Plaintiff was not employed by Defendant, and (2) Plaintiff cannot establish a basis for employer liability.

### 1. Plaintiff's Employment Status

Fundamentally, a hostile work environment claim must be brought by an employee against her employer. See, e.g., Fuentes v. Borough of Watchung, 286 F. App'x 781, 784 (3d Cir. 2008). Defendant argues that because the alleged harassment occurred during Plaintiff's interview before she was formally hired, Plaintiff was not an official employee of Defendant.

Defendant contends that while Penn could make hiring recommendations, Penn had no authority to hire Plaintiff, and even if Penn had authority to hire Plaintiff, Plaintiff never began her employment with Defendant.

Assuming Penn had authority to hire Plaintiff, the question here becomes, "when does one become an 'employee' such that they may receive the protections of Title VII?" Title VII defines "employee" as

> [A]n individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

42 U.S.C. § 2000e(f). This definition does not expressly

prescribe the moment when one becomes an employee.

Generally, "the precise contours of an employment relationship can only be established by a careful factual inquiry." Graves v. Lowery, 117 F.3d 723, 729 (3d Cir. 1997); see id. ("[A] plaintiff's status as an employee under Title VII can be determined only upon careful analysis of the myriad facts surrounding the employment relationship in question.") (quoting Miller v. Advanced Studies, 635 F. Supp. 1196 (N.D. Ill. 1986)) (emphasis in original). Defendant contends that Plaintiff was never an employee because she did not appear for new employee orientation the following Sunday and she never received compensation.[5] However, in viewing the evidence in the light most favorable to the Plaintiff, the Court finds that genuine issues of material fact exist with respect to the following questions:

- Was Penn authorized to offer Plaintiff the job?
- Did Plaintiff accept the offer?
- Was the offer contingent on Plaintiff returning the following Sunday for new employee orientation?

---

[5]  The parties point to Cimino v. Borough of Dunmore, No. 02-1137, 2005 WL 3488419, at *5-*6 (M.D. Pa. Dec. 21, 2005), and argue that the Court should consider the level of control Defendant had over Plaintiff. In that case, the court was examining whether an entity was the plaintiff's co-employer. As that is not the issue here, the Court need not consider this argument.

- If the offer was not contingent, did Plaintiff reject the offer, or was Plaintiff constructively discharged after she was subject to the alleged harassment and chose not to report for work?
- Would a reasonable jury find the alleged harassment to be sufficiently severe?

In light of these genuine issues of fact, the Court declines to find that Plaintiff's claim fails here.

### 2. Respondeat Superior Liability

Defendant next argues that Plaintiff cannot establish vicarious liability because Penn was not acting within the scope of his employment during the course of the interview. While it is true that "[a]n employer is not always vicariously liable for a hostile work environment," Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999), "it is well recognized that an employer is vicariously liable to a victimized employee 'for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.'" Hitchens v. Montgomery Cnty., 278 F. App'x 233, 236 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)). An "employer will ultimately be liable for the supervisor's conduct, provided that the supervisor took 'tangible employment action,' against the employee, which

14

includes employment related actions such as 'discharge, demotion, or undesirable reassignment.'" Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)) (internal citation omitted).

Here, the parties do not dispute that Penn was acting in a supervisory role as a shift manager, but there is no evidence that Penn took an adverse employment action against Plaintiff. "[I]f the supervisor charged with creating the hostile environment did not take [a] 'tangible employment action' against the employee, the employer may raise as an affirmative defense to liability," which is known as the Faragher-Ellerth defense. Id. (quoting Durham Life Ins. Co. v. Evans, 166 F.3d 139, 150 (3d Cir. 1999)); see also Link v. Trinity Glass Intern., Inc., No. 05-6342, 2007 WL 2407101, at *5 (E.D. Pa. Aug. 22, 2007) (noting the same). To successfully raise the defense, the defendant-employer must show "it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior . . . and that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise . . . .'" Hitchens, 278 F. App'x at 236 (quoting Durham Life Ins., 166 F.3d at 150).

While it is uncontested that Penn did not take a tangible employment action against Plaintiff, Defendant does not raise

15

the Faragher-Ellerth defense. Thus, the Court cannot conclude that Defendant is shielded from vicarious liability here. Accordingly, the Court will deny Defendant's motion with respect to Plaintiff's claim for hostile work environment.

**C.    Quid Pro Quo Sexual Harassment**

Plaintiff brings, in the alternative, a claim of quid pro quo sexual harassment as this claim may be brought by an applicant for employment.

The Third Circuit has held that:

> [u]nwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature constitute [quid pro quo] sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

Bonenberger v. Plymouth Twp., 132 F.3d 20, 28 (3d Cir. 1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997)) (alterations in original). "Those elements were modified by the Supreme Court in [Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)] to require an actual change in employment conditions in cases where a plaintiff refused to submit to advances." Moore v. Pennsylvania Dep't of Mil. & Veterans Affs., 216 F. Supp. 2d 446, 449 (E.D. Pa. 2002). Following Ellerth, the Third Circuit explained that "[t]o prove

16

a claim of quid pro quo sexual harassment, a plaintiff must demonstrate either that she submitted to the sexual advances of her alleged harasser" because of an explicit or implicit term or condition of the individual's employment, or that the Plaintiff "suffered a tangible employment action as a result of her refusal to submit to those sexual advances." Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 133 (3d Cir.), cert. denied, 528 U.S. 1074, (2000) (Cowen, J., concurring).

        1.    Plaintiff Cannot Sustain a Claim for Quid Pro Quo Sexual Harassment

Here, Plaintiff argues that the offer of employment was implicitly conditioned on Plaintiff complying with Penn's advances, including (1) allowing Penn to look through her phone, (2) viewing the images on Penn's phone, and (3) unbuttoning her shirt. First, though Plaintiff did give Penn access to her phone, Plaintiff offers no evidence, and no reasonable jury could find, that this act was implicitly or explicitly conditioned on Plaintiff receiving a job offer.[6] In fact, Plaintiff testified that he looked at her phone "before he got

---

[6] As Defendant points out, "Title VII quid quo pro sexual harassment generally requires that the harasser have authority to carry out the quid pro quo offer or threat." Bonenberger, 132 F.3d at 28. Though Defendant contends Penn did not have actual authority to hire candidates, the Court accepts the proposition Penn had the ability to influence Plaintiff's employment status because, at a minimum, Penn did have authority to recommend candidates to be hired.

sexual" so "I didn't have no problem with letting him see my phone." Pl. Dep. 116:19-20. Further, Plaintiff testified that Penn did not suggest that he would rescind an offer if she did not permit him to look at her phone. See id. at 116:21-24.

Next, while Plaintiff claims Penn showed her pictures of nude women on his phone, this was *after* Plaintiff received the job offer. Significantly, Plaintiff testified that Penn never suggested he would rescind the job offer if Plaintiff did not look at his phone. See id. at 116:25; 117:1-5. Thus, there is no evidence that the job offer was conditioned on Plaintiff agreeing to view the images on Penn's phone. See, e.g., Bonenberger, 132 F.3d at 28 (affirming the lower court's finding that no quid pro quo threat existed because the plaintiff's unofficial supervisor "did not suggest, either by word or action, that sexual favors were the price of keeping her job.").

Finally, after Plaintiff accepted Penn's oral offer of employment, Penn requested that Plaintiff unbutton her shirt. Plaintiff declined to do so. Because Penn did not rescind the job offer thereafter, Plaintiff did not suffer a tangible employment action for refusing to submit to Penn's advances.

Although, in the light most favorable to Plaintiff, Penn's conduct was inappropriate, based on the evidence Plaintiff presents, no reasonable factfinder could conclude that "she submitted to the sexual advances of her alleged harasser"

18

because of an explicit or implicit term or condition of the individual's employment, or that she "suffered a tangible employment action as a result of her refusal to submit to those sexual advances." Hurley, 174 F.3d at 133 (Cowen, J., concurring).

        2.    Constructive Discharge Cannot Serve as a Basis for this Claim

Even if Plaintiff were to argue that she chose to forego the offer of employment because of Penn's actions and, as a result, was constructively discharged, this argument would not be successful. As discussed, "quid pro quo harassment requires a direct conditioning of job benefits upon an employee's," or applicant for employment in this case, "submitting to sexual blackmail, or the consideration of sexual criteria." Bonenberger, 132 F.3d at 28. The Third Circuit has held that "[i]n the absence of evidence that the employer intended to force the plaintiff's resignation, constructive discharge cannot form the basis for quid pro quo sexual harassment." Id. There is no evidence that Penn intended to force Plaintiff's resignation. Thus, this cannot serve as the basis for Plaintiff's quid pro quo harassment claim.

Accordingly, Defendant's motion will be granted with respect to Plaintiff's claim for quid pro quo sexual harassment.

**V. CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's motion in part and deny it in part. An appropriate order follows.